IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| J. MARK DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-11-359-C |
| | ) | |
| PMA COMPANIES, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff J. Mark Davis brought this suit against Defendant PMA Companies, Inc. ("PMA") alleging breach of contract and the duty of good faith as well as wrongful termination. Plaintiff filed the present motion to compel the production of documents that Defendant claims are protected by the attorney-client privilege and work-product doctrine.

**I. APPLICABLE LAW**

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides for discovery of "<u>any nonprivileged matter</u> that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1) (emphasis added). The exclusion of privileged information from the otherwise "broad sweep of discovery," is an attempt to "strike a balance between promoting the truth-seeking goal of discovery and the purpose of the stated privilege." <u>Lindley v. Life Investors Ins. Co. of Am.</u>, 267 F.R.D. 382, 387 (N.D. Okla. 2010). In a case based on diversity jurisdiction, such as this one, state law governs claims of attorney-client privilege, while federal law controls the work-product doctrine. <u>Frontier Refining, Inc. v. Gorman-Rupp Co.</u>,

136 F.3d 695, 699, 702 n. 10 (10th Cir. 1998); see Fed. R. Civ. P. 26(b)(3); Fed. R. Evid. 501. The party asserting either protection has the burden of clearly showing its applicability. Peat, Marwick, Mitchell & Co. v. West, 748 F.2d 540, 542 (10th Cir. 1984). Because privileges "are in derogation of the search for truth," they are "construed narrowly." United States v. Kapnison, 743 F.2d 1450, 1456 (10th Cir. 1984).

The attorney-client privilege, codified at 12 Okla. Stat. § 2502, protects "confidential communications [between the attorney and the client] made for the purpose of facilitating the rendition of professional legal services to the client." 12 Okla. Stat. § 2502(B). The privilege "encourage[s] full and frank communication between attorneys and their clients," Upjohn Co. v. United States, 449 U.S. 383, 389 (1981), by "shield[ing] the client's confidential disclosures and the attorney's advice." Chandler v. Denton, 1987 OK 38, ¶ 19, 741 P.2d 855, 865. In order for the privilege to apply, the party asserting the privilege must establish: (1) the existence of an attorney-client relationship; (2) the confidential nature of the communication; and (3) that the communication was made for the purpose of seeking or providing legal advice. Lindley, 267 F.R.D. at 388-89.

Rule 26(b)(3) of the Federal Rules of Civil Procedure governs the attorney work-product doctrine. Frontier Refining, 136 F.3d at 702 n.10. The goal of Rule 26(b)(3) "is to protect 'an attorney's subjective analysis and substantive efforts in, or in anticipation of, litigation from use by the adverse party.'" Lindley, 267 F.R.D. at 388 (quoting Adams v. Gateway, Inc., Case No. 2:02-CV-10 TS, 2003 WL 23787856, at *8 (D. Utah Dec. 30, 2003)). The Rule provides that "documents and tangible things that are prepared in

anticipation of litigation or for trial by or for another party or its representative" are ordinarily not discoverable. A party may discover these "work-product" materials only upon a showing of (1) a substantial need for the materials and (2) an inability to obtain their substantial equivalent by other means without undue hardship. Fed. R. Civ. P. 26(b)(3)(A)(ii). However, "the mental impressions, conclusions, opinions, or legal theories of a party's attorney" receive heightened protection close to absolute immunity. Id. 26(b)(3)(B); see Lindley, 267 F.R.D. at 393-94 ("'This doctrine provide[s] an almost absolute protection for an attorney's mental impressions and conclusions.'") (quoting Hoffman v. United Telecomms., Inc., 117 F.R.D. 436, 439 (D. Kan. 1987)).

## II. ANALYSIS

### A. Documents Relating to the Geerhart Litigation, the California Pay Plan, and the California Release

Plaintiff seeks compulsion of the following documents: documents relating to a suit brought by an employee of Midlands Claim Administrators, Inc. ("MCA") against MCA ("Geerhart Litigation"); documents reflecting discussions about possible changes to California pay practices ("California Pay Plan"); and documents pertaining to a potential liability release ("California Release").[1] Defendant PMA argues that these documents and discussions are protected by the attorney-client privilege because of the involvement of

---

[1] These documents include emails withheld as privileged. In his Motion to Compel, Plaintiff objects to PMA's classification of entire email strings as privileged, without individual identification of each email. (Pl.'s Br., Dkt. No. 50, at 11.) Plaintiff correctly states that each email within a string is separate and must be reviewed separately for the purpose of privilege determination. However, PMA has addressed this deficiency and logged individual emails in its updated privilege log. (See Def.'s Br., Dkt. No. 51, at 15 n.12; id., Ex. 12.)

PMA's in-house counsel, Stephen Kibblehouse, and by the work-product doctrine. Plaintiff counters that no attorney-client relationship existed between MCA and PMA's in-house counsel and that the communications and documents were not made for the purpose of seeking legal advice, preventing application of the attorney-client privilege. Alternatively, Plaintiff asserts this his participation in the communications and his former position as president of MCA resulted in a "qualified" privilege that entitles him to access.

**1. Existence of an Attorney-Client Relationship**

As support for his assertion that no attorney-client relationship was formed, Plaintiff cites his own affidavit wherein he states that, with respect to the Geerhart Litigation, the California Pay Plan, and California Release, MCA was represented by outside counsel, Keith Bremer, not by PMA's in-house counsel. (Pl.'s Br., Dkt. No. 50, Ex. 3 ¶¶ 2-3.) Plaintiff claims that MCA did not rely on PMA's in-house counsel for legal advice and that any communications between MCA and PMA's in-house counsel were made as a result of either Mr. Kibblehouse's position as an officer of PMA and a board member of MCA's direct parent company or PMA's "insertion of its in-house counsel in the process." (Id. ¶¶ 4-6.)

In response, Defendant argues that there was an attorney-client relationship between PMA's in-house counsel and MCA and that PMA is also a "client" for the purpose of attorney-client privilege, giving it standing to assert privilege. Defendant offers the affidavit of Stephen Kibblehouse, general counsel of PMA, to support its claim of an attorney-client relationship between MCA and Mr. Kibblehouse. (Def.'s Br., Dkt. No. 51, Ex. 2 ¶ 2.) Mr. Kibblehouse states that his role as general counsel of PMA is to manage the legal affairs of

all of the PMA companies, including PMA's subsidiaries,[2] of which MCA is one, and provide centralized legal services and support. (Id. ¶¶ 2-5.) Mr. Kibblehouse claims that Plaintiff notified PMA's in-house legal department of the Geerhart Litigation and asked how they wished to proceed, to which PMA responded by authorizing retention of outside counsel. (Id. ¶¶ 5-6.) Mr. Kibblehouse maintains that even after hiring outside counsel, PMA representatives remained involved in the defense of the Geerhart Litigation and "worked directly" with the outside firm, offering legal review and advice. (Id. ¶¶ 7-9.)

Given the centralized nature of legal services at PMA and its subsidiaries, it is reasonable to believe that MCA, PMA's subsidiary, did have an attorney-client relationship with PMA's in-house counsel. But, even if MCA is considered a client, MCA is not a party to this lawsuit and has not asserted attorney-client privilege. The attorney-client privilege belongs to the client and must be invoked by the client or on the client's behalf. 12 Okla. Stat. § 2502(C); see Chandler, 1987 OK 38, ¶ 19, 741 P.2d at 865. PMA argues that because of its parent-subsidiary relationship with MCA, PMA is also a "client" for the purpose of asserting attorney-client privilege. Neither the Oklahoma courts nor the Tenth Circuit have decided that members of a corporate group are joint clients for the purpose of privilege. However, other courts have held that "the members of the corporate family are joint clients," especially because of the common practice of in-house centralization. In re Teleglobe

---

[2] PMA is the sole shareholder of Midlands Holding Corporation ("MHC"), which is the sole shareholder of Midlands Management Corporation ("MMC"), which is the sole shareholder of MCA.

Commc'ns Corp., 493 F.3d 345, 369, 372 (3d Cir. 2007).[3]  This reasoning is persuasive. Thus, for the purpose of the attorney-client privilege, PMA and MCA are joint clients, giving PMA standing to assert MCA's attorney-client privilege.

**2. In-House Counsel:  Legal vs. Business Purposes**

Even when an adequate attorney-client relationship exists, the attorney-client privilege will only block production when the communications in issue were made for the purpose of giving legal advice, which Plaintiff disputes.  Attorney involvement alone is insufficient to render a communication subject to the attorney-client privilege.  In re Grand Jury Proceedings, 616 F.3d 1172, 1182 (10th Cir. 2010); see also Scott v. Peterson, 2005 OK 84, ¶ 7, 126 P.3d 1232, 1234 ("Generally, the mere status of an attorney-client relationship does not make every communication between attorney and client protected by the privilege.").

---

[3] See also In re Grand Jury Subpoena #06-1, 274 F. App'x 306, 310-11 (4th Cir. 2008) (noting that "a number of courts have held that close corporate affiliation, including that shared by a parent and a subsidiary, suffices to render those entities 'joint clients' or 'co-clients,' such that they may assert joint privilege in communications with an attorney pertaining to matters of common interest"); United States v. Am. Tel. & Tel. Co., 86 F.R.D. 603, 615 (D.D.C. 1979) (holding that the "corporate 'client' includes not only the corporation by whom the attorney is employed or retained but also parent, subsidiary, and affiliate corporations"); Glidden Co. v. Jandernoa, 173 F.R.D. 459, 472 (W.D. Mich. 1997) (noting that the "universal rule of law" is that "the parent (as well as the subsidiary) is the 'client' for purposes of the attorney-client privilege" because of the parent and subsidiary's "community of interest"); (Restatement (Third) of Law Governing Law § 73 (2000) ("For purpose of the privilege, when a parent corporation owns controlling interest in a corporate subsidiary, the parent corporation's agents who are responsible for legal matters of the subsidiary are considered agents of the subsidiary."). See generally Andrew R. Taggart, Parent-Subsidiary Communications and the Attorney-Client Privilege, 65 U.Chi.L.Rev. 315 (1998) ("Ordinarily, the attorney-client privilege exists between a single entity (such as a corporation) and its counsel. . . .  The vast majority of courts, however, have held that communications between a parent and a subsidiary retain their confidential nature despite the fact that each party is a discrete legal entity.").

The communication must also relate to legal advice or strategy.  In re Grand Jury Proceedings, 616 F.3d at 1182.

In deciding whether a communication involved legal or business advice, many courts have applied heightened scrutiny to communications involving in-house counsel, given that many in-house attorneys also "'serve as company officers, with mixed business-legal responsibility.'"  Lindley, 267 F.R.D. at 389 (quoting Rossi v. Blue Cross & Blue Shield of Greater NY, 540 N.E.2d 703, 705 (N.Y. 1989)).  However, Oklahoma has not adopted a "heightened scrutiny" analysis or applied a rebuttable presumption that an in-house attorney's input "is more likely business than legal in nature."  See Lindley, 267 F.R.D. at 389-92 (applying a three-tier analysis to in-house communications rather than the "status presumptions").  Therefore, the Court does not presume that an in-house attorney's involvement was primarily for business purposes, but instead looks at each communication to determine whether it was made for the purpose of seeking or providing legal advice.  Id. at 391 (holding that the determination of whether a communication was made for legal purposes is "fact-driven").

Courts have relied on the affidavits and privilege logs submitted by the party claiming privilege when making the "legal purpose" determination.  In Motley v. Marathon Oil Co., 71 F.3d 1547 (10th Cir. 1995), the plaintiff argued that certain documents prepared by Marathon Oil's in-house counsel, John Miller, were not privileged because Marathon had failed to establish that they were prepared for a legal rather than a business purpose.  Id. at 1550.  The Tenth Circuit disagreed, pointing to Miller's affidavit, wherein he stated that he

had prepared the documents in issue for the purpose of giving legal advice for the corporate restructuring of Marathon, and that he "'did not render business advice in the Memorandum and Lists.'" Id. at 1551.  Because the plaintiff did not offer evidence directly contradicting Miller's statements, the court upheld the district court's conclusion that communications in issue were made for the purpose of providing legal advice, and were therefore privileged. Similarly, in a recent case, a court found documents "properly withheld from production" "[b]ased on the privilege log's detailed description of the documents." United Food & Commercial Workers Union v. Chesapeake Energy Corp., Case No. CIV-09-1114-D, 2012 WL 2370637, at *11 (W.D. Okla. June 22, 2012).  The privilege log's description of each document "include[d] a reference to its submission for the purpose of obtaining legal advice or comment and/or its receipt from the attorney, including references to documents including attorney notes or comments."  Based on this evidence, the court found that "[t]hese documents satisfy the attorney-client privilege requirements."  Id.

In the present case, PMA has offered the affidavits of two of its in-house attorneys as evidence that the communications and documents it seeks to protect were made for the purpose of rendering legal services.  In his affidavit, Stephen Kibblehouse, Senior Vice President[4] and General Counsel of PMA, states that "[a]s Executive Vice President and General Counsel, [he has] both legal and business responsibilities" but he is "familiar with

---

[4] Mr. Kibblehouse was Executive Vice President and General Counsel of PMA from June 2008 to October 1, 2010.  He has served as Senior Vice President and General Counsel from October 1, 2010 to the present.  (Def.'s Br., Dkt. No. 51, Ex. 2 ¶ 2.)

the distinction between these roles." (Def.'s Br., Dkt. No. 51, Ex. 2 ¶ 10.) He continues by claiming that "[i]n litigation matters, or matters that may result in litigation, [his] role is almost exclusively legal in nature." Thus, "[his] efforts to assist in the legal defense of the Geerhart Litigation were part of [his] regular, day-to-day activities as an attorney," "not part of [his] separate business duties." (Id.) Mr. Kibblehouse also states that his role regarding the revisions to internal pay practices were "part of [his] regular, day-to-day activities of providing legal services as general counsel of the PMA Companies," "not activities that [he] engaged in as part of [his] ordinary business, non-legal duties." (Id. ¶ 12; see id.) With respect to the employee releases, Mr. Kibblehouse asserted that his role "was not part of any regular, day-to-day business activities for PMA," but involved "the core legal services that [he] provide[s] as an attorney for PMA." (Id. ¶ 15.) The affidavit submitted by Stephen Gartner, Assistant General Counsel of Pennsylvania Manufacturer's Association Insurance Company, a subsidiary of PMA, includes similar language. (Def.'s Br., Dkt. No. 51, Ex. 6 ¶ 2). Mr. Gartner claims that he did not participate in the legal defense of the Geerhart Litigation, the revisions to internal pay practices, or the employee releases "for any business purpose unrelated to providing legal advice and performing legal services." (Id. ¶¶ 9, 12, 15.) Defendant PMA's privilege log likewise describes the withheld documents as relating to legal opinions or legal advice. (Def.'s Br., Dkt. No. 51, Ex. 12.) As in Motley and United Food, this evidence provides a basis for PMA's assertion of attorney-client privilege.

**3. "Qualified" Attorney-Client Privilege**

Alternatively, Plaintiff argues that even if PMA can establish the basic elements of attorney-client privilege, PMA cannot assert that privilege against Plaintiff, given Plaintiff's participation in many of the communications in issue and his former position as an officer and director of MCA. Neither the Oklahoma courts nor the Tenth Circuit have held that privilege is "qualified" or limited when asserted against former officers or directors. Instead, Plaintiff relies on three unpublished opinions[5] from other federal district courts. (Pl.'s Br., Dkt. No. 50, at 9-11.) In response, Defendant argues that the attorney-client privilege can only be waived by the corporate client's <u>current</u> management[6] and points to a line of cases rejecting the theory that former officers or directors are entitled to production of otherwise

---

[5] See Winner v. Etkin & Co., Case No. 2:07-cv-903, 2008 WL 2486130, at *5 (W.D. Pa. June 17, 2008) (noting in dicta that Etkin, the party seeking discovery, was either "within" the privilege or the privilege had been waived because of earlier conversations about the contested transaction); Carnegie Hill Fin., Inc. v. Krieger, Case No. 99-CV-2592, 2000 WL 10446, at *2 n.2 (E.D. Pa. 2000) (concluding that the policy underlying the attorney-client and work-product protections would not be furthered by denying former officers and directors of the corporation access to documents which they could have viewed upon request at any time during their tenure with the company); Resolution Trust Corp. v Adams, Case No. 93-389-CIV-ORL-18, 1994, WL 315646 (M.D. Fla. Apr. 14, 1994) (holding that a former director was entitled to discovery of reports or attorney product that he could have reviewed while director).

[6] See 12 Okla. Stat. § 2502(B) ("A <u>client</u> has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client.") (emphasis added); Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348-49 (a corporation's privilege is waived or asserted by <u>current</u>—not former or displaced—management, acting "in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals"); In re C.W. Mining Co., 636 F.3d 1257, 1262 (10th Cir. 2011) (holding "only active managers may exercise [a corporation's attorney-client] privilege" and that "former managers no longer have any role"), cert. denied, ___ U.S. ___, 132 S.Ct. 104 (2011).

privileged or protected documents.[7] The opposing cases relied on by Plaintiff and Defendant represent two schools of thought, known as the "collective corporate client" and "entity is the client" approaches. See Montgomery v. eTreppid Techs., LLC, 548 F. Supp. 2d 1175, 1184-85 (D. Nev. 2008).

The "collective corporate client" approach applies the joint client exception to corporate communications and documents, preventing the corporation from asserting the attorney-client privilege against a former officer or director. Id. at 1185. In Gottlieb v.

---

[7] Fitzpatrick v. Am. Int'l Grp., Inc., 272 F.R.D. 100, 108-09, 109 n.6 (S.D.N.Y. 2010) (rejecting plaintiff's arguments that his status as a (1)former officer and director or (2) author or recipient entitled him to access privileged communications); Gilday v. Kenra, Ltd., Case No. 1:09-cv-00229-TWP-TAB, 2010 WL 3928593, at *3 (S.D. Ind. Oct. 4, 2010) (adopting the position that a former employee's right to access privileged documents terminates upon leaving the corporation, even as to documents actually accessed during the former employment); Montgomery v. eTreppid Techs., LLC, 548 F. Supp. 2d 1175, 1187 (D. Nev. 2008) (concluding that the line of cases denying access to former officers and directors is more persuasive); Dexia Credit Local v. Rogan, 231 F.R.D. 268, 277 (N.D. Ill. 2004) (holding that "a corporation has a legitimate expectation that a person who leaves the control group no longer will be privy to privileged information"); Bushnell v. Vis Corp., Case No. C-95-04256 MHP, 1996 WL 506914, at *8 (N.D. Cal. Aug. 29, 1996) (following the line of cases which deny former directors the right to access privileged information); Milroy v. Hanson, 875 F. Supp. 646, 649-50 (D. Neb. 1995) (holding that current management can assert privilege against a dissident director); In re Hutchins, 216 B.R. 11, 16 (Bankr. E.D. Ark. 1997) (deciding, after reconsideration of its previous, opposite ruling, that privilege may be asserted against a former director); Genova v. Longs Peak Emergency Physicians, P.C., 72 P.3d 454, 462 (Colo. App. 2003) (agreeing "with the line of cases concluding that the attorney-client privilege may be established against a former director of a corporation"); Nunan v. Midwest, Inc., Case No. 2004/00280, 2006 WL 344550, at *7 (N.Y. Sup. Ct. 2006) (noting that "[a]lthough there is discredited authority to the contrary, most of the more recent cases embrace the view that, when a former officer or direct is suing the company for his or her own personal gain, the privilege belongs to the corporation and if asserted is effective to prevent disclosure to the former officer or director") (internal citations omitted); In re Mktg. Investors Corp., 80 S.W.3d 44, 50 (Tex. App.–Dallas 1998, no pet.) (finding the Milroy line of cases persuasive and concluding that a corporation may assert privilege against a former president); Lane v. Sharp Packaging Sys., Inc., 640 N.W.2d 788, 792 (Wis. 2002) (holding that former directors cannot view privileged materials).

Wiles, 143 F.R.D. 241 (D. Colo. 1992), the court analyzed whether the corporation could assert the privilege against the former director with respect to documents generated during the director's tenure. Id.  Relying on Kirby v. Kirby, Case No. CIV..A 8604, 1987 WL 14862 (Del. Ch. Jul 29, 1987), the court held it could not. Gottlieb 143 F.R.D. at 247.  The court analogized this situation to the scenario presented "when parties with a common interest retain a single attorney to represent them." Id.  If the joint clients later become adverse, "neither is permitted to assert the attorney-client privilege as to communications occurring during the period of common interest." Id.  The collective approach treats both the corporation and its managers as clients; thus, they are subject to the joint client exception.

Under the "entity is the client" approach, courts have rejected the Gottlieb/Kirby approach, claiming that those cases "make a fundamental error by assuming that for a corporation there exists a 'collective corporate "client"' which may take a position adverse to 'management' for purposes of the attorney-client privilege." See Milroy v. Hanson, 875 F. Supp. 646, 649 (D. Neb. 1995).  Courts adopting the "entity is the client" approach have held that the corporate entity or organization is the sole client for the purpose of attorney-client privilege. See id. ("There is but one client, and that client is the corporation."). Although the corporation acts through its managers, those managers are only representatives of the corporate client, not clients themselves. Id.  Accordingly, a former officer or director has no right to frustrate the attorney-client privilege, particularly when suing for personal benefit, rather than as a fiduciary. Id. at 650; see also Fitzpatrick v. Am. Int'l Grp., Inc., 272 F.R.D. 100, 108-09 (S.D.N.Y. 2010); Montgomery, 548 F. Supp. 2d at 1187.

In line with the modern trend,[8] the Court finds the Milroy line of cases to be more persuasive. First, in Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343 (1985), the Supreme Court held because a former officer or director could not assert or waive a corporation's privilege, the former officer or director "retains no control over the corporation's privilege." Id. at 349 n.5. A former manager retains control if he or she can prevent a corporation from asserting privilege because that in effect amounts to a waiver. Therefore, the Gottlieb/Kirby approach seems contrary to Supreme Court precedent. Moreover, allowing a former director access to privileged corporate documents "as a matter of course would have seemingly perverse implications." Fitzpatrick, 272 F.R.D. at 108. It seems paradoxical to allow a party to access information previously available to that individual only because of his or her role as a fiduciary once that party is adverse to the corporation and no longer required to act in the corporation's best interests. Id. Additionally, there seems to be a high potential for abuse, especially in the class action context, as one former officer or director could prevent the application of privilege against the entire class, none of whom previously had access to the sought-after documents and communications. See Barr v. Harrah's Entm't, Inc., Case No. Civ. 05-5056JEI, 2008 WL

---

[8] See Montgomery, 548 F. Supp. 2d at 1186 (noting that "many more courts have rejected the reasoning in Gottlieb than in Milroy"); Nunan v. Midwest, Inc., Case No. 2004/00280, 2006 WL 344550, at *7 (N.Y. Sup. Ct. 2006) ("Although there is discredited authority to the contrary, most of the more recent cases embrace the view that, when a former officer or director is suing the company for his or her own personal gain, the privilege belongs to the corporation and if asserted is effective to prevent disclosure to the former officer or director.") (internal citations omitted).

906351, at *6 (D.N.J. Mar. 31, 2008) (refusing to apply Kirby because of the case's class action context).

Therefore, Plaintiff's status as a former director and officer of PMA does not entitle him to production of otherwise privileged communications made during his tenure at MCA. Plaintiff also argues that he should at least be able to access communications that he once authorized, received, or otherwise participated in while president of MCA. However, this argument also fails. Plaintiff is not the client and has no right to access any privileged communications now that he is no longer employed by PMA, regardless of his prior involvement. When rejecting a similar claim, the court in Fitzpatrick noted by analogy "that, when a corporate fiduciary leaves the employ of the company, he is ordinarily bound to respect properly asserted corporate privacy interests, for example, by not appropriating trade secrets to which he may have been exposed during his tenure." Fitzpatrick, 272 F.R.D. at 109 n.6. Similarly, a former officer or director cannot appropriate knowledge he had access to as a corporate fiduciary after he has left that corporation's employ. Id.; see also Gilday v. Kenra, Ltd., Case No. 1:09-cv-00229-TWP-TAB, 2010 WL 3928593, at *4 (S.D. Ind. Oct. 4, 2010) (holding that a corporation "may assert the attorney-client privilege against [a former manager], even as to privileged documents she accessed during her employment"). Because the documents[9] sought by Plaintiff are subject to the attorney-client privilege, it is

---

[9] These protected documents include the drafts of the releases of claims relating to the California pay issues. Plaintiff's argument that drafts of documents intended to be published to third parties are not subject to privilege is unpersuasive. Although there might be non-binding caselaw to the contrary from other jurisdictions, this Court has previously held that even "drafts of documents ultimately publicly filed or disseminated continue to be protected by the attorney-

not necessary for the Court to analyze Defendant's alternative theory of work-product protection.

**B. Deposition Testimony**

In March 2012, Plaintiff took the depositions of three PMA officers: John Cochrane, Stephen Kibblehouse, and Andrew McGill. During each deposition, PMA's counsel objected and instructed the deponent not to answer on the grounds of attorney-client or work-product privilege. Plaintiff argues that answering the questions would not have infringed on privileged information and the deponents should have answered the questions posed.

Rule 30 provides that during a deposition, "[a] person may instruct a deponent not to answer . . . when necessary to preserve a privilege." Fed. R. Civ. P. 30(c)(2). This protection does not prevent the disclosure of facts but does protect confidential communications and mental impressions or legal theories which are subject to the attorney-client and work-product privileges. See Upjohn Co. v. United States, 449 U.S. at 395 (holding that privilege "only protects disclosure of communications" not "the underlying facts"); JPMorgan Chase Bank v. Liberty Mut. Ins. Co., 209 F.R.D. 361, 362 (S.D.N.Y. 2002) ("In a nutshell, depositions . . . are designed to discover facts, not contentions or legal theories, which, to the extent discoverable at all prior to trial, must be discovered by other means.").

**1. Deposition of John Cochrane**

---

client privilege absent certain circumstances." United Food, 2012 WL 2370637, at *10.

While deposing Mr. Cochrane, Plaintiff sought information about the disclosures PMA made to Old Republic Insurance Company ("ORIC") before, during, or after ORIC's acquisition of PMA.  Plaintiff's attorney asked, "What did Mr. Kibblehouse tell you about [PMA's disclosures to ORIC]?"  (Pl.'s Br., Dkt. No. 50, Ex. 4, at 4, ll. 19-20.)  Defendant's counsel objected, claiming that anything Mr. Kibblehouse had told Mr. Cochrane was privileged.  As a follow-up question, Plaintiff's counsel asked Mr. Cochrane if his testimony included any information "received from Mr. Kibblehouse."  (Id. at 5, ll. 9-11.)  Defendant's counsel objected on the grounds that the follow-up question was "an end run around the privilege."  (Id. at 5, l. 14.)

With respect to the attorney-client privilege, distinguishing between facts and communications is critical.  Although deponents must disclose known facts, it is well-established that clients cannot be forced to answer questions relating to what they told their attorneys, or what their attorneys told them.  See Upjohn, 449 U.S. at 395 ("'The client cannot be compelled to answer the question, "What did you say or write to the attorney?"'" (quoting Philadelphia v. Westinghouse Elec. Corp., 205 F. Supp. 830, 831 (D.C. Pa. 1962))).[10]  Plaintiff's first question clearly violates this rule by directly asking about the contents of a confidential communication between Mr. Cochrane and his attorney.  Thus, the Court will not compel Mr. Cochrane to disclose what Mr. Kibblehouse told him about the

---

[10] See also Banks v. Office of Senate Sergeant-at-Arms, 233 F.R.D. 1, 5 (D.D.C. 2005) (refusing to compel deponent to answer questions relating to what she told her attorney or what her attorney told her); In re CFS-Related Sec. Fraud Litig., 223 F.R.D. 631, 635 (N.D. Okla. 2004) ("[C]ommunications between the attorney and the client, even when the parties are discussing factual information, are protected by the attorney client privilege.").

disclosures to ORIC. Neither will the Court will compel Mr. Cochrane to answer whether he learned any of his information from Mr. Kibblehouse. Answering this question would reveal the "nature of the communication" between Mr. Cochrane and Mr. Kibblehouse by confirming that they had communicated about the disclosures. See In re CFS-Related Sec. Fraud Litig., 223 F.R.D. 631, 635 (N.D. Okla. 2004). Plaintiff was entitled to ask Mr. Cochrane to disclose any facts he was personally aware of that related to PMA's disclosures, as pointed out by Defendant's counsel. (Pl's Br., Ex. 4, at 5, ll. 2-7) (informing Mr. Cochrane that he could answer if Plaintiff's attorney asked him about his own knowledge rather than his communications with Mr. Kibblehouse). Plaintiff is not entitled to discover anything about the nature of Mr. Cochrane's communications with his attorney.

**2. Deposition of Stephen Kibblehouse**

The information sought by Plaintiff during his deposition of Stephen Kibblehouse is likewise subject to the attorney-client privilege. During Mr. Kibblehouse's deposition, Plaintiff asked him about the contents of a telephone conversation they had regarding the California Pay Plan and the California Releases. Specifically, Plaintiff asked Mr. Kibblehouse whether Plaintiff reported "that he had ethical concerns about what he was being asked to do by Mr. McGill regarding the employees of MCA in their California office." (Pl.'s Br., Dkt. No. 50, Ex. 5, at 4, ll. 3-7.) Defense counsel objected on the basis that the content of any conversation between Mr. Kibblehouse and Plaintiff in his role as president of MCA was privileged. Plaintiff argues that the communication was not privileged because

he was not seeking legal advice from Mr. Kibblehouse during the conversation at issue, but trying to report the activities of Mr. McGill.

The Court finds the Plaintiff's argument unpersuasive. The telephone conversation between Plaintiff and Mr. Kibblehouse was not limited to Plaintiff's ethical concerns but included a broader discussion about the legal ramifications of revising PMA's pay practices and seeking releases from PMA's California employees. (See Def.'s Br., Dkt. No. 51, at 23-24.) Plaintiff cannot use a self-serving declaration to isolate a particular segment of a conversation from its context when challenging PMA's assertion of attorney-client privilege. Plaintiff has pointed to no evidence, such as an internal reporting procedure, to support his assertion that he was seeking to report the activities of a PMA officer, rather than raise concerns about the legality of the California Pay Plan and the California Releases. Because the content of the conversation between Plaintiff and Mr. Kibblehouse is privileged, the Court will not order Mr. Kibblehouse to answer Plaintiff's question.[11]

**3. Deposition of Andrew McGill**

Plaintiff challenges Mr. McGill's failure to answer questions relating to Mr. McGill's prior use of employee releases and his handling of Plaintiff's ethical concerns. First, Plaintiff asked Mr. McGill if he had ever had employees of PMA or its subsidiaries sign releases similar to the proposed California Release. (Pl.'s Br., Dkt. No. 50, Ex. 6, at 12, ll. 15-19.)

---

[11] Because Mr. Kibblehouse cannot answer Plaintiff's first question on the basis of privilege, he also cannot answer Plaintiff's follow-up question, which had embedded within it an assumed answer to the prior question.

Mr. McGill was directed not to answer on the basis of privilege. (Id. at ll. 20-22.) However, whether Mr. McGill had previously obtained releases of employer liability from PMA employees is a fact, not a communication. As such, it is not protected by the attorney-client privilege. Nor is the fact of a release's existence protected by the work-product doctrine, although the releases themselves, if they exist, might be shielded as attorney work product, if prepared in anticipation of litigation. Mr. McGill must answer Plaintiff's question.

Mr. McGill must also answer Plaintiff's question relating to the handling of Plaintiff's ethical concerns. After Mr. McGill stated that he had not reported Plaintiff's concerns to PMA's audit committee, Plaintiff asked, "Well, wouldn't you consider the complaints [Plaintiff] was making . . . something you needed to document and report?" (Id. at 15, ll. 1-5.) Mr. McGill refused to answer on the basis of privilege. Plaintiff did not ask whether Mr. McGill received legal advice with respect to Plaintiff's ethical concerns or any reporting obligations, nor the content of any such advice. Instead, Plaintiff limited his question to whether Mr. McGill personally believed that the concerns raised by Plaintiff were the type of complaints that normally should be documented and reported. Mr. McGill's personal beliefs are not privileged as attorney-client communications or attorney work product. Therefore, he must answer Plaintiff's question.

## III.  CONCLUSION

For the above stated reasons, Plaintiff's Motion to Compel (Dkt. No. 50) is GRANTED IN PART and DENIED IN PART.  The motion is granted as to the two challenged questions from Mr. McGill's deposition.  Mr. McGill is hereby ORDERED to answer the above described questions.  In all other respects, the motion is DENIED.

IT IS SO ORDERED this 7th day of September, 2012.

*[signature]*
ROBIN J. CAUTHRON
United States District Judge