IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| J. MARK DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-11-359-C |
| | ) | |
| PMA COMPANIES, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. No. 57).
For reasons for fully set forth herein, the Court now GRANTS Defendants' Motion IN
FULL.

## I.  BACKGROUND

In 2007, Defendant PMA Companies, Inc. ("PMA") entered into a Stock Purchase
Agreement ("SPA") with Charles C. Caldwell, Thomas G. Hamill, Colin D. O'Connor, and
J. Mark Davis (collectively, "the Sellers").  Through the SPA, PMA purchased from the
Sellers all of the shares of Midlands Holding Company, the sole owner of Midlands
Management Corporation ("MMC").  Although the Sellers received an initial cash payment
for their shares, the SPA provided an opportunity to earn additional payments, conditioned
on MMC's performance over the next several years.  If MMC met the Adjusted Earnings
Before Interest earned, Taxes, Depreciation, and Amortization ("EBITDA")[1] targets set forth

---

[1]  Under the SPA, "Adjusted EBITDA" "means MMC's audited consolidated earnings
before taking into account any interest expense, income taxes, depreciation, and amortization for

in § 2.4(c)-(e) of the SPA, the Sellers had the opportunity to receive Earn-Out Payments, an Aggregate Look-Back Payment, and a Cumulative Incentive Payment.  Under the SPA, PMA covenanted to "cause MMC to continue to operate in a manner consistent with its past practice, policies and operations prior to the Closing Date" and "exercise its business judgment in a manner that is consistent with MMC and Sellers' efforts to achieve the Adjusted EBITDA that is required for Sellers to receive the Earn-Out Payments, the Aggregate Look-Back Payment and the Cumulative Incentive Payment."  (Def.'s Br., Dkt. No. 57, Ex. 1 at 34, 35.)

Prior to the SPA, Plaintiff Davis served as Executive Vice President of MMC.  In connection with PMA's stock purchase, MMC entered into a new, amended Employment Agreement with Davis whereby MMC agreed to employ Davis as Executive Vice President from October 1, 2007, until September 30, 2011.  However, on December 12, 2010, Davis resigned for "Good Reason," citing conduct constituting a material change in his duty, authorities, or responsibilities and a material breach by MMC of its obligations under the Employment Agreement.  In the event of a resignation for good reason, the Employment Agreement required MMC to pay Davis a severance package if Davis signed and did not revoke a valid general mutual release agreement.  Davis did not execute the required release and MMC has not made any severance payments to Davis.

---

the applicable period."  (Def.'s Br., Dkt. No. 57, Ex. 1 at 4.)

Davis filed the present suit on April 1, 2011, alleging that (1) PMA breached the SPA by (a) failing to exercise its business judgment in a manner consistent with Davis's efforts to achieve the conditional bonus payments and (b) operating MMC in a manner inconsistent with its past practices, policies, and operations; (2) PMA intentionally interfered with the Employment Agreement between Davis and MMC; (3) PMA breached the duty of good faith by acting to prevent Davis from achieving the additional payments; and (4) constructively discharged Davis by controlling MMC and creating intolerable employment conditions.[2] Defendant has moved for summary judgment on all four of Plaintiff's causes of action.

## II.  LEGAL STANDARD

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it affects the disposition of the substantive claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted).  If the movant satisfactorily demonstrates an absence of genuine issue of material fact with respect

_____

[2]  Davis's Complaint also contained two other counts, brought against MMC only. However, the Court dismissed MMC as a non-diverse, dispensable party upon Plaintiff's request. (Order of July 22, 2011, Dkt. No. 25.)

to a dispositive issue for which the non-moving party will bear the burden of proof at trial, the non-movant must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.  A court considering a summary judgment motion must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

## III.  DISCUSSION

### A.  Count I:  PMA's Breach of the Stock Purchase Agreement

Davis's breach of contract claim alleges that PMA breached §§ 7.5(a)(i) and (iii) of the SPA.  PMA argues that regardless of whether its actions constituted a breach, summary judgment is appropriate because Davis did not follow the proper notice procedure before bringing suit, meaning he has not established an express condition precedent.  Additionally, PMA asserts that Oklahoma does not recognize "tortious breach" under the circumstances of this case.

### 1.  Section 7.5 Notice

Section 2.5 of the SPA provides a remedy in the event that PMA commits a material breach of § 7.5(a)(i) or (iii) and that breach "is not cured or resolved by the procedures set forth in such Section."  (Def.'s Br., Ex. 1 at 14.)  The procedure necessary to trigger § 2.5's remedy is found in § 7.5(b).  (Id. at 35.)  Under § 7.5(b), the "Sellers shall give [PMA] written notice of any respect in which the Sellers believe that any change made by [PMA]

constitutes a material breach of its obligations set forth in this Section 7.5." (Id.)  Among

other requirements, the Section 7.5 Notice must "be given promptly and in any event within

ten (10) days following the date that the Sellers shall have Knowledge that such change has

been made or the date upon which the Sellers have been advised by [PMA's] chief executive

officer that such change will be made." (Id.)  Although PMA acknowledges that Davis sent

it a purported Section 7.5 Notice on November 12, 2010, PMA contends that notice was

deficient in two respects:  (1) it was not from "Sellers," collectively, and (2) it was not

timely.

Section 7.5(b) directs the "Sellers" to give PMA proper notice, not an individual

Seller.  The SPA defines and distinguishes between "Sellers" and a "Seller" in its very first

paragraph:

> THIS STOCK PURCHASE AGREEMENT is made as of the 1st day of
> October, 2007, by and among PMA CAPITAL CORPORATION, a
> Pennsylvania corporation (the "Buyer"), CHARLES C. CALDWELL
> ("Caldwell"), THOMAS G. HAMILL ("Hamill"), COLIN D O'CONNOR
> ("O'Connor") and J. MARK DAVIS ("Davis") (collectively the "Sellers," and,
> individually, a "Seller") and Midlands Holding Corporation, an Oklahoma
> corporation, solely for the purpose of Section 2.7.

(Def.'s Br., Ex. 1 at 1 (emphasis added).)  Thus, under the SPA, Davis alone is a "Seller,"

whereas Davis, Hamill, Caldwell, and O'Connor together comprise the "Sellers."  Because

only Davis sent the Section 7.5 Notice, Defendants contend it did not come from Sellers, as

required by § 7.5(b).

In response, Davis argues that § 7.5(b) does not require collective notice, relying on

a constructive provision in § 1.1.  Section § 1.1(c) provides that "[d]efinitions shall be

equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neutral gender shall include each other gender."  However, "it is well established under the generally applicable rules governing contract interpretation that specific provisions . . . take precedence over more general provisions."  Cogswell v. Merrill Lynch, Pierce, Fenner & Smith Inc., 78 F.3d 474, 480 (10th Cir. 1996) (citing Mutual Life Ins. Co. v. Hill, 193 U.S. 551, 558 (1904)).  The express language distinguishing between Seller and Sellers takes precedence over a general canon of construction.

Moreover, the collective nature of § 2.5's remedy clarifies why § 7.5(b) requires notice from all the Sellers, collectively.  Section 2.5, once triggered, requires PMA to "pay [all] Sellers in cash the sum of the maximum amount of the Earn-Out Payments and the Cumulative Incentive Payment that could have been earned."  (Def.'s Br., Ex. 1 at 15.)  In contrast, the individual remedy provided by § 8.3 requires only individual action.  Under § 8.3, PMA will "indemnify each Seller" for "any and all Losses arising from or related to . . . any material breach, non-fulfillment or violation of any covenant or agreement made by [PMA] in [the SPA]."  (Id., Ex. 1 at 37.)  To seek individual indemnification, § 8.7 requires only individual notice from the party claiming a loss.

Davis makes one final argument against PMA's assertion that he did not comply with § 7.5(b), claiming that even if § 7.5(b) required collective notice, a subsequent email from another Seller remedied the problem, bringing the Sellers into substantial compliance.  On December 17, 2010, Thomas Hamill sent an email stating, "'I want to preserve whatever rights we Sellers may have.'"  (Pl.'s Resp., Dkt. No. 63, at 12 & Ex. 8.)  However, Hamill's

December email is not sufficient to satisfy § 7.5(b)'s condition precedent of adequate notice: it was not from all the Sellers, it did not describe with particularity a material breach, nor did it ask PMA to take any particular action.  Thus, there was no substantial compliance. Because the Sellers collectively did not give adequate notice under § 7.5(b), § 2.5's remedy is not applicable.[3]

## 2.  Exclusivity

Davis argues that regardless of whether he complied with § 7.5(b), summary judgment on his breach of contract claim is inappropriate because § 2.5's remedy is not exclusive.  It is true that § 2.5 is not the only remedy available to Davis.  Section 8.3 also provides a remedy—indemnification.  However, Davis has not sought indemnification under § 8.3 or followed § 8.7's corresponding claim procedure.  Moreover, § 8.11, entitled "Exclusive Remedy," states that "[e]xcept for Sellers' rights under Section 2.5, the rights to indemnification provided for in this Section 8 shall constitute the <u>exclusive remedy</u> of . . . Sellers . . . with respect to matters in any way relating to this Agreement or arising in connection herewith, whether under any laws, at common law or otherwise." (Def.'s Br., Ex. 1 at 39 (emphasis added).)  Section 8.11 clearly establishes that disgruntled Sellers like Davis have two remedies in the event of a material breach:  § 2.5's collective remedy or § 8.3's individual indemnification.

---

[3]  PMA also argues that Davis's Section 7.5 Notice was untimely.  However, because the Court agrees that § 7.5 required collective notice, it need not address whether the faulty notice was timely.

3.  Tortious Breach of Contract

In his Complaint, Davis alleged not only that PMA breached the SPA, but that it "tortiously breached the Stock Agreement."  However, "tort claims for a contemporaneous breach of contract are generally not permitted under Oklahoma law."  KT Specialty Distribution, LLC v. Xlibris Corp., Case No. 08-CV-0249-CVE-SAJ, 2008 WL 4279620, at *3 (N.D. Okla. Sept. 11, 2008).  Oklahoma courts recognize tortious breach of contract only in limited circumstances, such as in the context of certain special relationships.  See Rodgers v. Tecumseh Bank, 1988 OK 36, 756 P.2d 1223, 1225-27 (declining to extend tortious breach of contract cause of action recognized in Christian v. Am. Home Assurance Co., 1977 OK 141, 577 P.2d 899; distinguishing insurance contracts as adhesion contracts, made for the purpose of eliminating risk, and involving a special relationship).  Because the SPA, like the contract in Rodgers, is the product of an arms-length transaction and there is no special relationship between PMA and Davis, PMA cannot be liable for tortious breach of contract.

B.  Count II:  PMA's Interference with the Employment Agreement

Count II of Davis's Complaint asserts that "PMA intentionally interfered with the Employment Agreement by improperly and unfairly circumventing Davis' authority, purposely ensuring Davis could not fully perform his duties under the Employment Agreement."  (Compl., Dkt. No. 1, at 7, ¶ 31.)  Under Oklahoma law, to establish a claim of tortious interference with a contractual or business relationship, a plaintiff must prove: "(1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage."  Wilspec Techs., Inc. V. DunAn Holding Grp., Co., Ltd., 2009 OK 12, ¶ 15, 204 P.3d 69, 74.  Especially pertinent to this case, "the claim is viable only if the interferor is not a party to the contract or business relationship."  Id.

The Oklahoma Supreme Court has not answered whether a parent corporation is party to the contracts or business relationships of its subsidiaries.  However, the Oklahoma Court of Civil Appeals recently addressed that question in Hawk Enterprises, Inc. v. Cash America International, Inc., 2012 OK CIV APP 66, 282 P.3d 786.  In Hawk, the court held that there was no per se rule preventing parent corporations from being held liable for tortious interference with the contracts of their subsidiaries.  Id. ¶ 19, 292 P.3d at 794.  Rather, courts must determine whether a particular parent can be liable "on a case by case basis, analyzing the factors provided in the Restatement [(Second) of Torts § 767]."  Id.

9

Focusing on the last of § 767's seven factors, the relationship between the parties, the Hawk court reversed summary judgment and remanded the case for additional proceedings. In analyzing whether the parent-defendant was a stranger to the contract between its subsidiary and the plaintiff, the court looked both at the nature of the underlying agreement—a franchise contract between the plaintiff and the subsidiary, for which the parent had signed a guaranty—and the relationship of the parent and subsidiary. Emphasizing that "the exact relationship between [the subsidiary] and the [parent-defendant] [was] not fully developed in this record," meaning it was unclear whether the parent wholly or only partially owned the subsidiary and the extent of the decision-making authority and control of the parent over the subsidiary, the court directed the parties to address those "material" issues on remand.  Id. ¶¶ 20-22, 292 P.3d at 795.

Unlike in Hawk, the relationship between the parties in this case is clear.  Not only does PMA wholly own MMC, the SPA expressly gave PMA control over MMC by granting PMA three of the five positions on MMC's Board of Directors.  Moreover, the contracts involved in this matter are different than those at issue in Hawk.  PMA is not just a guarantor of one party's obligations to another agreement.  In contrast, the Employment Agreement between MMC and Davis came about as a result of the SPA between PMA and Davis.  Given the nature of the contracts and PMA's control over MMC, PMA is a party to the Employment

10

Agreement.  Thus, since the alleged interferor—PMA—is not a stranger or third-party, Davis cannot maintain a cause of action for tortious interference.[4]

## C.  Count III:  PMA's Breach of the Duty of Good Faith

Davis's third cause of action alleges he "has been damaged by PMA's breach of its duty of good faith under the [SPA]."  (Compl. at 7, ¶ 37.)  Oklahoma recognizes the "obligation to exercise good faith and fair dealing."  First Nat'l Bank & Trust Co. of Vinita v. Kissee, 1993 OK 96, ¶ 24, 859 P.2d 502, 509.  However, generally, "a breach of the implied covenant of good faith and fair dealing merely results in a breach of contract," not an independent tort.  Id.  Only in special circumstances has the Oklahoma Supreme Court recognized a claim for tortious breach of contract based on the implied duty of good faith. See, e.g., Rodgers, 1988 OK 36, 756 P.2d at 1225-27 (refusing to extend duty to commercial loan contracts); RJB Gas Pipeline Co. v. Colo. Interstate Gas Co., 1989 OK CIV APP 100, ¶ 58, 813 P.2d 1, 11 (declining to extend duty to private take-or-pay gas purchase contracts).

For example, in Rodgers, the Oklahoma Supreme Court refused to extend the implied duty of good faith and fair dealing—recognized in the context of insurance agreements—to commercial loan contracts "because of the inherent differences between insurance policies and commercial loan agreements."  Rodgers, 1988 OK 36, ¶ 13, 756 P.2d at 1227.  Unlike other contracts, insurance policies are adhesion contracts that involve a special relationship and are entered into for the purpose of eliminating risk.  Id. at 1226-27.  Thus, the court held,

---

[4]  The Court does not find it necessary to address PMA's alternative argument that Davis cannot establish an interference with a contractual right.

"[w]here, as here, there is no special relationship, parties should be free to contract for any lawful purpose and upon such terms as they believe to be in their mutual interest. To impose tort liability . . . for every breach of contract would only serve to chill commercial transactions." Accordingly, only when the facts indicate "[g]ross recklessness or wanton negligence" might a remedy in tort be available. Id., 1988 OK 36, 756 P.2d at 1226, ¶ 16.

Davis relies on Beshara v. Southern National Bank, 1996 OK 90, 928 P.2d 280, for an example of a case in which the Oklahoma Supreme Court recognized a bad faith tort in the context of a commercial contract. In Beshara, the plaintiff alleged that his bank withheld the funds in his account in an intentional and malicious manner, and in reckless and wanton disregard for his rights as a customer. 1996 OK 90, 928 P.2d at 288. Viewing all inferences in the plaintiff's favor, the court reversed summary judgment in favor of the defendant and held that the plaintiff "should have been allowed the opportunity to proceed on his allegations for tortious breach of the duty of good faith and fair dealing." Id. at 1996 OK 90, ¶ 28, 928 P.2d at 288. However, this case is more reminiscent of RJB Gas Pipeline, where "[t]he parties' relationship was founded on contracts agreed to at arms length between the parties, both of which are experienced in their fields." 1989 OK CIV APP 100, ¶ 59, 813 P.2d at 12. PMA's actions did not amount to gross negligence or reckless disregard of Davis's rights under the SPA.

D.  Count VI:  PMA's Wrongful Termination/Constructive Discharge

Finally, Davis contends that PMA, acting through MMC, forced him to resign by making his working conditions intolerable.  When an employer "intentionally ma[kes] or allow[s] the employee's working conditions to become so intolerable that a reasonable person in the employee's situation would feel that [he] had no choice but to quit," the employer can be held liable for "constructive discharge."  OUJI CIV 21.8.  Here, Davis claims that he had to give MMC notice of material breach of the Employment Agreement because of PMA's actions.  Section 6(f)(iv) of the Employment Agreement permitted Davis to resign for "Good Reason" if MMC committed a material breach of any of its obligations to Davis under the Employment Agreement.  (Def.'s Br., Ex. 4 at 4.)  Resigning for good reason under § 6(f) entitled Davis to the generous severance package described in § 7(b). However, in order to trigger MMC's obligation to pay severance compensation, David had to first sign a valid general mutual release, as required by § 7(b)(iv) of the Employment Agreement.   Davis argues that he should receive compensation for his resignation notwithstanding § 7(b)(iv)'s release requirement because MMC's breach of the Employment Agreement relieved Davis from complying with any of its provisions.  This logic ignores the fact that Davis agreed to all of the provisions in the Employment Agreement, including the requirement that he sign a release to obtain severance compensation in the event of a voluntary resignation for "Good Reason," or a resignation resulting from MMC's material breach.   Therefore, summary judgment on Davis's constructive discharge claim is appropriate.

IV.  CONCLUSION

Accordingly, the Court hereby GRANTS IN FULL Defendant's Motion for Summary Judgment (Dkt. No. 57).  Judgment will be entered in favor of Defendant PMA Companies, Inc.  Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 56) is thus MOOT. All remaining pending motions are stricken as moot.

IT IS SO ORDERED this 7th day of March, 2013.


ROBIN J. CAUTHRON
United States District Judge